HAYES, Plaintiff in error, v. STATE, Defendant in error.*

*No. State 88.   Argued April 11, 1968.—Decided May 7, 1968.*
(Also reported in 158 N. W. 2d 545.)

---

\* Motion for rehearing denied, without costs, on September 6, 1968.

For the plaintiff in error there was a brief and oral argument by *Robert H. Bichler* of Racine.

For the defendant in error the cause was argued by *Betty R. Brown*, assistant attorney general, with whom on the brief were *Bronson C. La Follette*, attorney general, *William A. Platz*, assistant attorney general, and *Gerald E. Clickner*, district attorney of Racine county.

CONNOR T. HANSEN, J.   This case presents three issues for consideration:

1.   Whether the evidence found in the room in Waukegan, Illinois, was properly admitted in evidence.

2.   Whether exculpatory statements made by the defendant during the June 23d interrogation were properly admitted into evidence.

3.   Whether the trial court erred in not giving an instruction on third-degree murder.

(1)   On June 22, 1965, while investigating a burglary of the Perma Cast Corporation, Racine police arrested one Felix Baker as he was attempting to cash a Perma Cast check at a local supermarket. Baker was searched and the police found, on his person, a social security card and a membership card bearing the name of the decedent, Henry Winkel. Baker told the police that he had been given the cards by the defendant that morning as he and the defendant took a train from Waukegan to Racine. Baker also informed the police that defendant said he had found the cards at a place called Midland and that such cards were to be used as identification in cashing one of the stolen and forged Perma Cast checks.

Baker also told the police that he and the defendant lived in and shared a room in Waukegan. In response to a request from the police, he gave them his consent, both orally and in writing, to search the room.

Shortly thereafter, the defendant was located at the railroad station, arrested for the Perma Cast burglary and taken to the police station. After arriving at the police station the defendant was briefly interrogated by the Captain of Detectives who testified as follows:

"*A*.   I told him, Peewee (defendant), I'm going to ask you some questions. Before doing so, I want to advise you, you do not have to answer any of them. If you do, it must be of your own free will and accord. I am not going to promise you anything, nor am I going to threaten or harm you in any way, and I want to advise you that anything you say or write can be used against you in the event of a trial. I also want to advise you you have the right to an attorney."

The defendant was then asked if it would be permissible to search his room in Waukegan. The defendant replied that he did not own a room in Waukegan.

Thereupon, Baker, the Captain of Detectives and another Racine police officer went to the Waukegan room without a search warrant to search the same for evidence relating to the Perma Cast burglary. Baker also stated

he had some clothes in the room. At Baker's request, the landlady unlocked the door to the room. She became very nervous and requested them to "get all the stuff out of my house as quick as you can."

In the room, the police found a check-protector machine and a book of checks belonging to Perma Cast Corporation. They also observed a paper bag which was being used as a wastebasket. In examining the contents of the bag they found some rumpled Perma Cast checks and stubs, and a wallet bearing the name of Henry Winkel stamped in gold lettering which contained numerous pieces of identification bearing decedent's name. In addition, during the search, they found a photograph of defendant, a pair of trousers bearing blood stains, a green head scarf and a dark blue sport coat.

During the morning of June 23, 1965, the Captain of the Detectives again questioned the defendant. The interrogation was reduced to writing by a stenographer who was present and it commenced with the following question and answer:

"*Q.* Peewee (defendant), I am going to ask you some questions. Before doing so, I want to advise you that you don't have to answer any of them. If you do, it must be of your own free will and accord. I am not going to promise you anything nor am I going to threaten or harm you in any way and I want to advise you that anything you say or write could be used against you in the event of a trial. You also have a right to an attorney. Do you understand that? *A.* I understand that. Why should I go through all the trouble when I didn't do anything. I mean I rent a room in Waukegan to look for a job. I went down there at Chicago Pattern Company and the guy told me he would send me a card on the 21st of the month."

The defendant was then shown the items found in the Waukegan room. He, at this time, acknowledged he had been living in the Waukegan room, but denied any involvement in the Winkel murder. He stated that he found the Winkel wallet and identification at a dance and had

not given any identification cards to Baker, but that Baker must have taken them unbeknown to the defendant. He admitted the trousers were his, but during the questioning attributed the blood spots to various sources.

Later in the day the defendant told the police he wanted to contact a certain lawyer. No further interrogation took place. The police assisted defendant in contacting the lawyer. Subsequently, the same lawyer was appointed by the court to represent the defendant because of his indigency.

Investigation subsequently revealed that the room was rented to Baker and the defendant on June 7, 1965, for the rate of $15 per week. On June 13, 1965, Baker checked out and the landlady reduced defendant's weekly rent to $12 per week. Defendant paid the $12 rental on June 13, 1965, but no payment had been made for the week commencing June 20, 1965. On the morning of June 22, 1965, the day of the search, the landlady saw Baker and the defendant leaving the room. There were two keys to the room. The landlady kept one and gave one to the defendant.

The defendant's denial of a possessory interest in the Waukegan room lies at the heart of the validity of the search thereof.

A careful examination of the record reflects that there is no indication the police knew the true nature of the possessory interests in the room before commencing the search. The police were pursuing evidence in connection with their investigation of the Perma Cast burglary.[1] They discovered evidence which included the check protector, a book of Perma Cast checks and also a paper bag used as a wastebasket which contained some Perma Cast

[1] The record reflects that during the trial, counsel for defendant acknowledged that the search of the room by the Racine police was proper as to the investigation of Baker's participation in the Perma Cast burglary and that the evidence with respect thereto properly came into their possession.

check stubs, crumpled Perma Cast checks and the bill-fold of Henry Winkel.

Prior to the search the defendant denied any ownership in the room and at one point stated to the police that it was Baker's room. Baker did not inform the police that he was no longer a tenant in the room, but on the contrary stated that he was such a tenant. He gave them his oral and written permission to conduct the search. The land-lady did not inform the police that Baker was no longer her tenant. Baker was present at the time of the search and she ordered him to get the property out of the room.

The trial court correctly determined that there could be no unlawful search of premises in which the defendant disclaims any interest. *See Rossi v. United States* (7th Cir. 1932), 60 Fed. 2d 955, affirmed, 289 U. S. 89, 53 Sup. Ct. 532, 77 L. Ed. 1051; *Creech v. United States* (5th Cir. 1938), 97 Fed. 2d 390; *United States v. Eversole* (7th Cir. 1954), 209 Fed. 2d 766.

We have considered *Jones v. United States* (1960), 362 U. S. 257, 80 Sup. Ct. 725, 4 L. Ed. 2d 697, and *Simmons v. United States* (1968), 390 U. S. 377, 88 Sup. Ct. 967, 19 L. Ed. 2d 1247, and conclude that the rationale of *Jones* and *Simmons* does not encompass the situation in the case now under consideration. Under these cases the defendant's testimony in an unsuccessful motion to suppress could not be used against him at his trial.

In this case, the defendant was not confronted with the problem presented in *Jones* and *Simmons*. There was no pretrial motion to suppress.[2] The defendant specifically disclaimed any interest in the premises. This statement coupled with Baker's consent and the acquiescence of the

---

[2] The defense made no pretrial motion to suppress as required by sec. 955.09 (3), Stats. Although the trial court could have ruled such failure to constitute waiver, it listened to extensive arguments on the merit of this question and ruled such evidence admissible. Said procedure was within the trial court's proper discretion. *See State v. Stevens* (1965), 26 Wis. 2d 451, 458, 132 N. W. 2d 502.

landlady constitute reasonable grounds for the search. *See Bucholtz v. Warden of Maryland Penitentiary* (1963), 233 Md. 614, 195 Atl. 2d 690; *Commonwealth v. Mayer* (1965), 349 Mass. 253, 207 N. E. 2d 686; *Bowman v. State* (1962), 211 Tenn. 38, 362 S. W. 2d 255.

The search, having been determined to be reasonable and lawful in connection with the Perma Cast burglary, the other items of property found in connection therewith were properly seized. *See Abel v. United States* (1960), 362 U. S. 217, 80 Sup. Ct. 683, 4 L. Ed. 2d 668; *State v. Stevens, supra,* at page 459.

(2) We now consider the question of whether the statements made by the defendant during the June 23, 1965, interrogation were properly admitted into evidence.

The trial in this case began on November 29, 1966. *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694, was decided on June 13, 1966. *Johnson v. New Jersey* (1966), 384 U. S. 719, 86 Sup. Ct. 1772, 16 L. Ed. 2d 882, ruled that *Miranda* applies to all cases in which the trial commenced after the date of the decision, viz., June 13, 1966. Therefore, since this case was tried after June 13, 1966, it was subject to the rules of *Miranda. See also Holloway v. State* (1966), 32 Wis. 2d 559, 566, 146 N. W. 2d 441.

Mr. Chief Justice WARREN summarized the mandate of *Miranda, supra,* page 478, as follows:

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, *and that if*

*he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.* Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (Emphasis added.)

The warnings concerning the Winkel murder that were given to the defendant at the time he was interrogated were recorded by a stenographic reporter and have heretofore been set forth. The warnings given the defendant were inclusive; however, in June of 1965, the Captain of Detectives had no way of foreseeing the pronouncement of the standards by the United States Supreme Court a year later in *Miranda*. In the light of the *Miranda* rule they were inadequate since the defendant was not informed that he was entitled to court-appointed counsel if he could not afford one. The defendant was twenty years of age, possessed a ninth grade education and was obviously indigent. Therefore, under the *Miranda* rule the only conclusion we can reach is that the exculpatory statements made by the defendant were improperly admitted into evidence.

It then becomes necessary to determine whether the admission of the exculpatory statements constituted harmless error under the standards enunciated in *Chapman v. California* (1967), 386 U. S. 18, 23, 87 Sup. Ct. 824, 17 L. Ed 2d 705.

". . . We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. Connecticut*, 375 U. S. 85. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' *Id.,* at 86–87. Although our prior cases have indicated

that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error,[3] this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal."

The testimony of 14 witnesses, including the six witnesses who saw the defendant at, near, or running from the Winkel shop on the afternoon of June 3, 1965, and the physical evidence, present an overwhelming picture of defendant's guilt. Under all of the circumstances in this particular case, the admission of certain exculpatory statements which noted some inconsistencies, is here determined to be harmless error beyond a reasonable doubt. *See Chapman, supra,* at page 24. The integrity of the fact-finding process was in no way infected by the admission of these statements. Other jurisdictions have also determined that under certain limited situations the inadequacy of custodial warnings may be harmless error. *Guyette v. State* (1968 Nevada Supreme Court), 438 Pac. 2d 244; *Commonwealth v. Wilbur* (1967 Massachusetts Supreme Court), 231 N. E. 2d 919, review denied by United States Supreme Court, 390 U. S. 1010, 88 Sup. Ct. 1260, 20 L. Ed. 2d 161; *State v. Gillespie* (N. J. Super. Ct., March 20, 1968), 3 Cr. L. 2039. Compare: *Anderson v. Nelson, Warden* (April 1, 1968), 3 Cr. L. 4006, prosecutor's extensive comments to jury that defendant's silence was an inference of guilt in violation of the rule of *Griffin v. California* (1965), 380 U. S. 609, 85 Sup. Ct. 1229, 14 L. Ed. 2d 106.

(3)   The defendant contends that the trial court erred in failing to give an instruction to the jury on third-degree murder.

[3] *See, e.g., Payne v. Arkansas* (1958), 356 U. S. 560, 78 Sup. Ct. 844, 2 L. Ed. 2d 975 (coerced confession); *Gideon v. Wainwright* (1963), 372 U. S. 335, 83 Sup. Ct. 792, 9 L. Ed. 2d 799 (right to counsel); *Tumey v. Ohio* (1927), 273 U. S. 510, 47 Sup. Ct. 437, 71 L. Ed. 749 (impartial judge).

There was no request for such an instruction by either the state or the defendant. This question has been considered by this court on many occasions. It has been consistently held that in such a situation the trial court committed no error in not, on its own motion, giving such an instruction when no request is made. *Green v. State* (1968), 38 Wis. 2d 361, 156 N. W. 2d 477, and cases therein cited. The record reflects that the defendant was ably represented by experienced trial counsel.

Furthermore, such instruction would certainly have been entirely inconsistent with the alibi defense presented by the defendant.

*By the Court.*—Judgment affirmed.

WILKIE, J. (*concurring*). While I agree with the majority I would go one step further. I would extend *Goodchild* [1] to provide for a pretrial hearing on whether exculpatory statements such as those made in the instant case were made under circumstances which meet the tests not only of *Goodchild* but of *Miranda*. [2] In the interest of better administration of criminal justice I think it would be an improvement for the trial court sitting alone to decide any objection on *Miranda* grounds in such a pretrial proceeding.

Following such a hearing the court's findings would have to be made beyond a reasonable doubt and the state would have that burden of proving compliance with *Miranda* or a waiver of those requirements. The determination would be subject to the same standard of review by this court as are rulings on the admissibility of confessions challenged as involuntary. [3]

[1] *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753.

[2] *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694.

[3] *McKinley v. State* (1967), 37 Wis. 2d 26, 36, 154 N. W. 2d 344, and cases cited therein.

Just as confessions questioned as being involuntary, or evidence seized in what is contended to be an illegal search and seizure, may be challenged in a pretrial proceeding so should confessions, admissions, or exculpatory statements argued as being delivered or taken down without compliance with *Miranda.*

I am authorized to state that Mr. Chief Justice HALLOWS joins in this opinion.

